**UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA**

**CASE NO. 08-14054-CR-MOORE/LYNCH**

**UNITED STATES OF AMERICA,**

      **Plaintiff,**

**v.**

**JOE LOUIS HAWKINS, JR.,**

      **Defendant.**

_____/

FILED by _____ D.C.

FEB - 5 2009

STEVEN M. LARIMORE
CLERK U.S. DIST. CT.
S.D. OF FLA. - FT. PIERCE

**REPORT AND RECOMMENDATION ON
DEFENDANT'S MOTION TO SUPPRESS [D.E. #35]**

    **THIS CAUSE** having come on to be heard upon the Defendant's Motion To Suppress and this Court having reviewed the motion, the government's response, and having conducted an evidentiary hearing on February 4, 2009, at which time this Court received evidence and arguments of counsel, this Court recommends to the District Court as follows:

    1.    The first witness called by the government was Deputy Mathisen of the Indian River County Sheriff's Office. He was the arresting officer in this case. He has a total of eight years in law enforcement.

    2.    On the date in question, June 6, 2008, Deputy Mathisen was on duty on routine patrol with his canine unit. This was the mid to late evening hours of that date. While on routine traffic patrol, he observed a vehicle, later determined to be driven by this Defendant, coming towards him from the opposite direction. As the Defendant's vehicle passed, Deputy Mathisen noticed that the Defendant stared at the deputy's vehicle as opposed to watching where he was driving. This called Deputy Mathisen's attention to the vehicle. The deputy

observed the Defendant swerve off the roadway onto the shoulder of the right hand portion of the road where the Defendant was traveling. The Defendant then made a turn.

3.    Based upon this observation of the Defendant staring at him and the Defendant having run off the highway, Deputy Mathisen turned around and began pursuing the vehicle to make a traffic stop. He began pursuing the Defendant's vehicle with his blue lights on at first and then later had to turn on his siren as well. Government Exhibit No. 1 in evidence is a DVD recording of the pursuit by Deputy Mathisen of the Defendant's vehicle. Deputy Mathisen testified that the video recording device in his patrol unit is automatically turned on when he activates his blue lights. He does not have to do anything manually to activate. This is why there is no observation of the Defendant running off the highway since the recording device was not activated until the deputy had turned around and began pursuing the Defendant's vehicle with his emergency lights on.

4.    This Court has reviewed the DVD both in court during the hearing and on three different occasions subsequent to the hearing. This Court categorizes the pursuit as a low speed pursuit. It does not appear as though either the Defendant's vehicle nor the patrol car were traveling at abnormal speeds. Nevertheless, it is clear from the video recording that the Defendant knew or should have known that Deputy Mathisen was pursuing him directly behind his vehicle. The video recording clearly shows the reflection of the flashing blue lights coming off the Defendant's vehicle from the deputy's vehicle and the siren is audibly heard as well.

5.    The video shows the Defendant making at least two turns while Deputy Mathisen is obviously right behind him attempting to pull him over. The Defendant's vehicle was seen pulling down a dead-end road where he then pulls his vehicle up next to a home. Testimony at the hearing was that this was not his home and, in fact, that the occupants of the home did not know this Defendant.

2

6.     The video shows Deputy Mathisen making loud demands of the Defendant to get out of the vehicle and get on the ground. Deputy Mathisen is heard saying this several times. The Defendant did not comply. With the patrol vehicle search light shining through the back of the Defendant's vehicle, the Defendant is seen reaching around in the vehicle and even reaching into the back to retrieve a long metal object. This long metal object later was determined to be a cane or metal crutch that the Defendant had for a foot injury he had sustained prior to this incident. This Court points out that it was in the evening hours when the stop took place. The testimony also indicated that the traffic stop by Deputy Mathisen took place in what the Indian River County Sheriff's Office terms to be a high crime area known for drug activity.

7.     The Defendant finally emerged from his vehicle with his metal cane or crutch. Deputy Mathisen is seen walking up to the vehicle along with a couple of other deputies who eventually assist. The Defendant offers no resistence, but is handcuffed immediately by one of the deputies. The Defendant is overheard asking why he was stopped. Deputy Mathisen is overheard telling the Defendant that he just could not keep driving away from the deputy without pulling over simply because he wanted to keep driving. The Defendant is heard stating that he did not think that the deputy was after him. The Defendant said that he heard earlier through his brother that people were being arrested in that area, so he thought that maybe the deputy was heading in that direction. The Defendant stated that he was driving to go pick his brother up.

8.     Deputy Mathisen stated that he arrested the Defendant for a felony traffic charge of fleeing and eluding. He is seen reading the Defendant his Miranda rights from a card the deputy pulls from his shirt pocket. This is almost immediately after the Defendant gets out of the vehicle and is handcuffed. For the record, the Miranda rights read from the

3

card do appear to comply with the requirements under the applicable case law. However, this Court will review that later in the analysis portion of this Report and Recommendation.

9.      After Deputy Mathisen finishes reading the Miranda rights, he is heard asking the Defendant if he wished to speak with them having those rights in mind. The Defendant is heard saying, "No." Deputy Mathisen then indicates that is fine and begins to walk away back to his patrol unit while other deputies are securing the Defendant and searching the vehicle. The Defendant is then heard saying to Deputy Mathisen as he begins walking away, "Talk about what?".

10.     On the video admitted into evidence, the Defendant is seen making certain statements that this Court categorizes as being voluntary and spontaneous. To put things in proper perspective for the District Court, the Defendant is first advised of his Miranda rights. The Defendant is then asked with those rights in mind did he wish to speak with the officer. The Defendant responds to this by saying, "No." Deputy Mathisen then indicates that is fine and begins to walk back to his patrol car. It is then the Defendant is heard making the statement, "Talk about what?". Subsequent to the Defendant making that statement, there was no other questioning of the Defendant at the scene on the video. However, there are certain voluntary and spontaneous statements that the Defendant makes as he is being handcuffed and as he observes items being retrieved from his vehicle. Once again, any statements that the Defendant is seen making at that time appear to be spontaneous, voluntary, and not in response to any questions by any of the  officers at the scene. Additionally, this Court has no evidence before it that the comments being made by the officers at the scene in the presence of the Defendant were made for the purpose of eliciting any statements from the Defendant.

11.     Deputy Mathisen testified that Deputy Dixon was the individual who actually searched the interior of the Defendant's car. Deputy Mathisen testified that since there was

4

no other individual at the scene who could take custody of the car, the car was being inventoried and impounded pursuant to the felony arrest of the Defendant. It is noted that the Defendant was the only occupant of the vehicle, and as indicated earlier herein the occupants of the home next to where the Defendant pulled his vehicle, did not know the Defendant.

12.     Shortly after the Defendant's arrest and while the Defendant is still standing handcuffed next to the vehicle, a brown bag is seen being taken from the interior of the vehicle.  The brown bag was found to contain various plastic baggies with a total of approximately 72 grams of crack cocaine and 58 grams of powder cocaine. The cocaine seized is depicted in photographs submitted into evidence as Government's Exhibits 2 through 7 inclusive.

13.     It was then decided that the Defendant would be transported to the jail while the inventory and impoundment of the Defendant's vehicle was completed. The video stops at this point. The Defendant was transported by another deputy other than Deputy Mathisen.

14.     Deputy Mathisen completed his duties at the scene and went to the jail to complete his paperwork.  He estimated that approximately 45 to 60 minutes later he went to the booking area of the jail where the Defendant was seated in a wheelchair. As indicated earlier, the Defendant had stated on the record that he had a broken foot prior to this arrest and had a metal crutch with him.  According to the testimony, the Defendant was given a wheelchair at the Indian River County Jail.

15.     Deputy Mathisen testified that he went to talk with the Defendant at the booking area after completing his paperwork so that he could explain the charges to the Defendant and also to clarify what the Defendant meant when the Defendant said, "Talk about what?" after he told Deputy Mathisen that he did not want to speak. Deputy Mathisen met with the Defendant at the booking area and reminded him of the Miranda rights that he had

5

previously read to him and reminded the Defendant that he had previously said he did not want to talk. Deputy Mathisen then reminded the Defendant that he said "Talk about what?" and told the Defendant it was up to him as to whether or not he wanted to talk about anything further. The Defendant then indicated he did wish to speak with Deputy Mathisen.

16.     The Defendant told Deputy Mathisen that his wife had rented the car approximately a week ago. He was on his way to Gifford to pick up his brother. He did not stop when Deputy Mathisen had his blue lights and siren on because he did not realize that the deputy was after him and just wanted to go pick up his brother. The Defendant stated that he knew the drugs were in the vehicle, but they were not his. When asked by Deputy Mathisen if he wished to speak with a narcotics detective, the Defendant said that he would.

17.     Deputy Mathisen contacted Detective Dilks of the Indian River County Sheriff's Office to come speak with the Defendant. This Court will go into more detail concerning this interview by Detective Dilks with the Defendant later when it reviews Detective Dilks' testimony from the hearing. Deputy Mathisen was present during the interview of the Defendant by Detective Dilks, but he was not taking notes nor paying that close attention to the conversation. Deputy Mathisen estimated that it took one-half hour to an hour for Detective Dilks to arrive after he called him. This was approximately two hours after the arrest.

18.     When Detective Dilks arrived, the Defendant was wheeled out of the booking area through the sallyport into an outer area where trustees work during the day. The Defendant was in a wheelchair and comfortable according to the testimony. He did not pay that close attention to what was being said. He did overhear the Defendant say that he knew the drugs were in the vehicle but they were not his. He did overhear the Defendant say something about realizing that he may be able to make some money by selling the cocaine to some persons and that is what he was going to do.

6

19. On cross-examination, Deputy Mathisen said that he would not have stopped the Defendant if the Defendant had not run off the roadway. He did not write a traffic citation for the infraction of running off the roadway, but the Defendant was arrested for the felony charge of fleeing and eluding. The Defendant stared at Deputy Mathisen as he passed to such a degree that it caused the Defendant to lose track of where he was driving and drive off the roadway. This is what initially caused Deputy Mathisen to turn around. If he had not seen the traffic infraction, he still would have followed the Defendant because of the way the Defendant was staring at him, and he would have run the tag through his dispatcher to make sure that the vehicle was not stolen. He believes that the tag on the vehicle was run through his dispatcher. He does recall that there was nothing to indicate that the vehicle was stolen.

20. On cross-examination, Deputy Mathisen admitted that the Defendant did not have any firearms nor bulges in any of his clothing. He confirmed that he told the Defendant several times that he just could not keep driving while a deputy is behind him with blue lights and a siren attempting to pull him over. If the Defendant was concerned about pulling over in a well-lit area, Deputy Mathisen testified that the Defendant passed several areas by stores or businesses which were well-lit where he could have pulled in. However, he did not. The Defendant made several turns and ended up on a dead-end dirt road next to a house which was not his.

21. Deputy Mathisen testified that the center console of the Defendant's vehicle was closed and that the brown bag was found inside the center console. He did not take part in the actual search nor did he observe the search while it was going on. This was handled by other deputies at the scene as referenced above. Deputy Mathisen did conduct a field test on the cocaine seized from the brown paper bag and it tested positive for the presence of cocaine.

22.     Deputy Mathisen testified that the Defendant appeared to understand his Miranda rights when he read them at the scene.  Additionally, when he confronted the Defendant at the jail to explain the charges against him and to clarify what the Defendant meant when the Defendant had said, "Talk about what?", he reminded the Defendant of his Miranda rights which had just been previously read within the past hour. He testified that the Defendant understood those rights.  Once again, he emphasized that he was simply attempting to clarify the Defendant's statement of "Talk about what?" when he went to speak with the Defendant at the booking area of the jail.

_____

23.     The next witness to testify for the government was Detective Dilks of the Indian River County Sheriff's Office.  He has been in the Narcotics Division of that department for three years.  He has been in law enforcement since 2001.

24.     He was called to the jail to interview the Defendant in this case.  He did not previously know the Defendant to be anyone involved in narcotics in the Indian River County area.  He was told by Deputy Mathisen that the Defendant wished to speak with him.  He knew that the Defendant had already been read his Miranda rights.

25.     Detective Dilks said it took about ten to fifteen minutes from his home to the jail.  He reminded the Defendant of his Miranda rights.  The Defendant said that he understood his rights and remembered that they had been read to him earlier by Deputy Mathisen. The Defendant confirmed that he wanted to speak with Detective Dilks. Detective Dilks estimated that this was somewhere between 10:00 p.m. and 11:00 p.m. when he arrived at the jail.

26.     Detective Dilks testified that the Defendant appeared comfortable and was seated in a wheelchair.  He was not handcuffed.  He had been brought outside the sallyport

work area. The Defendant appeared very calm. Detective Dilks stated that when individuals are speaking with detectives concerning other crimes, they are taken out of the normal booking area where they cannot be observed by other inmates or persons under arrest. This is why the Defendant was brought out to this area.

27.     The Defendant told Detective Dilks that his wife had rented the car approximately a week ago. He found the crack and powder cocaine in the car. He denied that it was his, but said that he was going to take it to Gifford to sell.

28.     Detective Dilks told the Defendant that he did not believe him because the amount of drugs found in the vehicle had a street value of anywhere from $8,000 to $10,000. Detective Dilks, in his experience as a narcotics officer, does not believe that a narcotics dealer would simply leave that amount of narcotics behind in a rental car without retrieving it.

29.     On cross-examination, Detective Dilks stated that the entire interview with the Defendant took no more than ten to fifteen minutes. He explained that the Defendant was not taken back inside the jail to an interview room because he did not believe what the Defendant was telling him. He testified that his normal procedure is to do an initial interview of an individual to see what they know before deciding to go into an interview room and conduct a formal interview. Since the Defendant was not taken into an interview room, no video nor audio recording was made. Additionally, Detective Dilks did not take any notes. He did write a report which summarized the statement the Defendant gave him.

30.     Detective Dilks knew nothing about the traffic stop nor the search of the Defendant's vehicle. There was no written Miranda waiver signed since Detective Dilks was satisfied that the Defendant understood his Miranda rights after he reminded him about those having just been previously read to the Defendant at the scene by Deputy Mathisen.

9

31.     Detective Dilks identified the Defendant in court as the individual who Deputy Mathisen said that he had arrested in respect to this investigation and as being the same person who he spoke with outside the sallyport area at the jail sitting in a wheelchair that evening.

32.     The Defendant presented no witnesses or evidence at the hearing.

## ANALYSIS

33.     The government makes no challenge to the Defendant's standing.   The evidence suggests that the Defendant's wife was the one who leased the vehicle a week prior to this incident. He apparently had the authority to be operating the vehicle. Therefore, this Court considers that he has standing to challenge the search even though the vehicle was not titled to him and may not have been rented by him. There is no evidence to suggest that he did not have authorization to operate the vehicle.

34.     The Defendant's motion suggests that the search was illegal, improper and should be suppressed. Additionally, the motion suggests that the statements made by the Defendant at the jail to Deputy Mathisen and later Detective Dilks, should be suppressed based up a violation of the Defendant's Fifth Amendment rights.

35.     The Court will address the search of the Defendant's vehicle first. The video clearly reflects the Defendant refusing to stop for the deputy who had activated his blue lights and siren. The Defendant is seen making at least two turns on the video and finally heads down what ends up being a dead-end dirt road. He pulls his vehicle next to a home owned by individuals not known to the Defendant. The Defendant then refuses to obey the deputy's commands to get out of the vehicle and get on the ground. Instead, the Defendant is clearly seen reaching around inside the vehicle and then reaching into the back of the vehicle and retrieving a long metal object which later turned out to be a cane or a crutch. The video then

reflects the Defendant continuing to disobey the commands of the deputy who told him to stop and put his hands on the vehicle. The Defendant is seen continuing to walk back to the deputy's vehicle while using the metal crutch. It is only after other deputies get there and assist in taking the Defendant into custody that the Defendant is taken back up to his vehicle and handcuffed.

36.     Even though the chase depicted in the video was what this Court would categorize as a "low speed chase", it was clear to this Court that the Defendant knew or should have known he was being pursued by Deputy Mathisen. There were no other vehicles in front of the Defendant. There were no other vehicles passing the Defendant and the deputy did not try to pass the Defendant. The siren is audible on the video as well as the reflection of the flashing blue lights.

37.     The Defendant was lawfully arrested for felony fleeing and eluding based upon the testimony received by this Court. He was the sole occupant of the vehicle. His fleeing and attempting to elude Deputy Mathisen is an offense in the State of Florida for which the Defendant can be subject to a warrantless arrest. United States v. Gonzalez, 71 F.3d 819 (11th Cir. 1996). Further, once the Defendant, as the sole occupant of the vehicle, was arrested, the Fourth Amendment permits the officers to contemporaneously conduct a warrantless search of the Defendant, the passenger compartment of the vehicle, and any containers found therein. This would include a glove box or console as was the case in this matter. See Gonzalez, supra.

38.     Under the exception permitting a warrantless search under the Fourth Amendment, a search incident to such a lawful arrest is permissible even when the Defendant is arrested and has already exited the vehicle. United States v. Olbel, 275 Fed. Appx. 910 (11th Cir. 2008). The Defendant was arrested immediately outside the vehicle and within close proximity to the interior of the vehicle where the narcotics was later found.

This is very similar to the facts in the Olbel decision. See also Virginia v. Moore, 128 S.Ct. 1598 (2008).

39. Detective Mathisen testified that it is the policy of his department to inventory any vehicle which is going to be seized and impounded as the Defendant's was in this case. Such an inventory search following the defendant's arrest and done pursuant to department policy is authorized. United States v. Crawford, 294 Fed. Appx. 466 (11th Cir. 2008). The Eleventh Circuit in United States v. McCalla, 286 Fed. Appx. 610 (11th Cir. 2008), upheld an inventory search in a very similar case to the case at bar. In that instance the officers observed a traffic violation where the defendant's vehicle had been swerving out of the lane that he was driving. A pursuit ensued and a passenger from the vehicle shot at the officers during the pursuit. The vehicle was stopped and the occupants arrested. The warrantless search of the vehicle was justified as an inventory search since the officers had the authority to impound the vehicle which had been used in the commission of a felony. Therefore, if the District Court in this case does not agree that the warrantless search was a justifiable exception as being incident to the Defendant's arrest, then the cases permitting an inventory search would apply in this Court's view.

40. Pursuant to the inventory search, the inevitable discovery doctrine enters into the analysis as well. In order for evidence to qualify for admission under the inevitable discovery exception to the exclusionary rule, there must be a reasonable probability that the evidence in question would have been discovered by lawful means and the government must establish that the lawful means which made the discovery inevitable were being actively pursued prior to occurrence of any illegal conduct or search. United States v. Delancy, 502 F.3d 1297 (11th Cir. 2007) and Jefferson v. Fountain, 382 F.3d 1286 (11th Cir. 2004).

41. After the Defendant's arrest, the officers were doing an inventory of the vehicle pursuant to their department policy. Even if their search incident to an arrest is deemed to

be illegal or invalid, the evidence would have ultimately and inevitably been discovered through their inventory search. Therefore, the inevitable discovery of evidence doctrine would be applicable.

42.    This Court now addresses the Defendant's post-arrest statements. The Defendant is seen being read his Miranda rights on the video. Deputy Mathisen did this by way of a card. The rights read to the Defendant appear to this Court to comply with the decision in Miranda v. Arizona, 384 U.S. 436 (1966) and its progeny. The Defendant is heard on the video saying "no" in response to Deputy Mathisen's question as to whether or not he wished to speak with the officers having his Miranda rights in mind. Deputy Mathisen is then seen saying something similar to "that's fine" and walks away towards his patrol car and out of view while the other deputies continue the search of the vehicle and securing the Defendant. The Defendant is heard immediately saying to Deputy Mathisen, "Talk about what?".

43.    The testimony then reflects that at the jail, some 45 minutes to 60 minutes later, Deputy Mathisen wished to clarify the Defendant's statement made at the scene when he said "Talk about what?" and to explain the charges for which he had been arrested.

44.    The government must establish by a preponderance of the evidence that the Defendant waived his rights knowingly and voluntarily. The use of a Miranda card is permissible as it was in this case since the card was department issued and it is the one Deputy Mathisen testified is used routinely by him and other members of his department. United States v. Wright, 2008 WL 4874446 (11th Cir. 2008).

45.    Deputy Mathisen considered the Defendant's statement at the scene to be an equivocation or an ambiguous statement as to whether or not he really wished to talk to the deputy or not. When something like this occurs, the courts have found that it is "good police practice for interviewing officers" to clarify whether the suspect actually wants an attorney.

13

However, law enforcement officers are not required to do so. <u>Davis v. United States</u>, 114 S.Ct. 2350 (1994). In <u>Davis</u>, the defendant made a statement, "Maybe I should talk to a lawyer." The Supreme Court found that this was not a request for counsel and the agents questioning the defendant were not required to stop any questioning. However, it was "entirely proper" for them to clarify whether, in fact, he wanted a lawyer or to speak further.

46.     In this instance, after being read his <u>Miranda</u> rights and asked if he wished to speak, the Defendant unequivocally stated "no." However, almost immediately after that, Deputy Mathisen is seen walking away from the Defendant back to his patrol car and the Defendant immediately says, "Talk about what?". This Court finds that could be considered an equivocal statement and Deputy Mathisen did have a right to inquire of the Defendant to clarify whether or not he wished to speak any further with any law enforcement officer. In determining whether or not the Defendant wished to speak any further and whether or not any such statements were voluntary, the Court must consider the totality of the circumstances surrounding the conduct of the officers and the surrounding circumstances where the Defendant was questioned. <u>United States v. Thompson</u>, 422 F.3d 1285 (11th Cir. 2005). In this instance, the Defendant was provided a wheelchair at the booking area. There is no evidence that the Defendant was badgered, coerced, subjected to a long interrogation, denied medication, denied food, drink, or any other circumstance which would be considered government coercion.

47.     The evidence suggests that the Defendant was reminded of the <u>Miranda</u> rights by Deputy Mathisen which had been read within the past hour at the scene. Deputy Mathisen's testimony is that the Defendant understood his rights both at the scene and at the jail after he reminded him of those rights. He did not attempt to clarify the Defendant's statement until after he was certain that the Defendant was reminded of his <u>Miranda</u> rights. After the Defendant indicated that he understood his <u>Miranda</u> rights and remembered having

14

been read those rights, Deputy Mathisen inquired as to what the Defendant meant when he said, "Talk about what?". The Defendant continued to have the right to refuse to speak with Deputy Mathisen. However, the Defendant, without any evidence of coercion of any type, stated that he wished to talk with Deputy Mathisen. The resulting statement to Deputy Mathisen, referenced in detail by this Court earlier herein, then took place.

48.     At the conclusion of the statement by the Defendant to Deputy Mathisen, he asked the Defendant if he wished to speak with a narcotics detective. Once again, the Defendant having been reminded of his Miranda rights, could have refused to speak any further. However, he said that he would speak with the detective. Detective Dilks was then called to the jail.

49.     After Detective Dilks arrived, he once again reminded the Defendant of his Miranda rights. Detective Dilks' testimony is that it took him 10 to 15 minutes to get to the jail after being called and Deputy Mathisen thought it took a half hour to an hour. This is not a serious enough discrepancy in the evidence for this Court to disbelieve either Detective Dilks or Deputy Mathisen. Nevertheless, after arriving at the jail, Detective Dilks reminded the Defendant of his Miranda rights which had been previously read to him. The Defendant indicated that he recalled those rights and remembered them. Detective Dilks testified that the Defendant was sitting comfortably with his leg up in a wheelchair. He was outside. He was not subjected to any long interrogation. The entire interview took no longer than 10 to 15 minutes. The Defendant was calm and seemed comfortable according to Detective Dilks' testimony. At no time during the questioning by Deputy Mathisen or Detective Dilks did the Defendant indicate that he wished the questioning to stop. As a result, the clarification of the equivocal statement and the subsequent statements made by the Defendant are admissible. See United States v. Mikell, 102 F.3d 470 (11th Cir. 1996).

15

50.     Based on all of the foregoing, this Court finds that the initial stop and arrest of the Defendant were lawful. The Defendant was arrested for a felony committed in the presence of the officer. The warrantless search of his vehicle, of which he was the sole occupant, is a justified exception as a search incident to his lawful arrest. Alternatively, the inventory of the Defendant's vehicle pursuant to the department policy of the Indian River County Sheriff's Office would have inevitably led to the discovery of the narcotics in the vehicle and is admissible under that theory as well.

51.     The Defendant initially indicated his desire to not speak with any law enforcement officer. However, he did make the statement on his own which Deputy Mathisen believed to be equivocal. When seeking to clarify what the Defendant meant when he said "Talk about what?", the Defendant agreed to speak with both Deputy Mathisen and later Detective Dilks. His post-arrest statements are therefore admissible.

52.     The video also reflects that after the Defendant was advised of his <u>Miranda</u> rights, indicated his desire to not speak with Deputy Mathisen and then said, "Talk about what?", the Defendant is overheard making spontaneous and voluntary statements to the other officers at the scene while he is being handcuffed and the search of his vehicle is being conducted. These statements appear to this Court to be spontaneous and voluntary. They were not the result of any questions by any deputy at the scene subsequent to the Defendant being advised of his <u>Miranda</u> rights. Some of his statements are inaudible to this Court and this is why this Court is not certain as to whether or not they have any evidentiary value to either the government or the Defendant in this case. Nevertheless, this Court felt it appropriate to address any statements which may have been made by the Defendant subsequent to his <u>Miranda</u> rights at the scene.

53.     There is no evidence that the Defendant was questioned further at the scene by any law enforcement officer. Any statements made by him at the scene which are heard

16

on the videotape, are spontaneous statements and are not the subject of any interrogation or questioning by any officer. Further, any comments made by the officers at the scene to one another concerning the evidence that may have been found and seized from the vehicle, do not appear to have been made with the intention of eliciting a response from this Defendant. As a result, any of those voluntary statements made on the video by the Defendant subsequent to his being advised of his <u>Miranda</u> rights are found to be admissible as well.

**ACCORDINGLY,** this Court recommends to the District Court that the Defendant's Motion To Suppress [D.E. #35] be **DENIED.**

The parties shall have ten (10) days from the date of this Report and Recommendation within which to file objections, if any, with the Honorable K. Michael Moore, United States District Judge assigned to this case.

**DONE AND SUBMITTED** this _5th_ day of February, 2009, at Ft. Pierce, Northern Division of the Southern District of Florida.

FRANK J. LYNCH, JR.
UNITED STATES MAGISTRATE JUDGE

cc:
Hon. K. Michael Moore
AUSA Theodore M. Cooperstein
David Joffe, Esq.